P. J. ANDERSON & SONS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
P. J. Anderson & Sons v. Commissioner
Docket No. 21927-81.
United States Tax Court
T.C. Memo 1983-323; 1983 Tax Ct. Memo LEXIS 464; 46 T.C.M. (CCH) 382; T.C.M. (RIA) 83323; June 7, 1983. *464 John R. Kline and Johnette Sullivan, for the petitioner. Richard W. Kennedy and R. Alan Lockyear, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended June 30, 1976 in the amount of $92,443.28. The principal issue for decision is whether petitioner's subsidiary forgave petitioner's debt during the year in issue. If we answer this question in the affirmative, we must then decide whether such forgiveness constitutes an ordinary distribution taxable under section 301 [1] or a partial liquidation (within the meaning of section 346) taxable under section 1248. FINDINGS OF FACT Most of the facts have been stipulated and are found accordingly. Petitioner P. J. Anderson & Sons is a Montana corporation. At the time that it filed its petition in this case petitioner's principal office was located in Conrad, Montana. Petitioner timely filed a Federal income tax return (Form 1120) for the fiscal year ended June 30, *465 1976 with the Internal Revenue Service Center at Ogden, Utah. Prior to its incorporation, P. J. Anderson & Sons was operated as a partnership. Organized in 1943 by Vernon Anderson and his wife Genevieve, the partnership carried on a mustard seed business. Although the production of mustard seed was originally concentrated in Montana, it later expanded into other regions, particularly into Canada. From 1944 through 1950 the partnership obtained increasing amounts of mustard seed from the province of Alberta.In 1950 the partnership constructed a plant in Milk River, Alberta. In the mid-1950's the partnership organized Milk River Grain, Ltd. (hereinafter "MRG"), a Canadian corporation. MRG was formed for the purpose of carrying on a small grain and mustard seed business in Canada. The partnership found it necessary to incorporate in Canada in order to facilitate the acquisition of credit from Canadian bankers. Vernon Anderson became the president of MRG and Genevieve Anderson its secretary-treasurer. In 1960 Vernon and Genevieve Anderson incorporated their partnership. Vernon Anderson became the president and 50-percent shareholder of petitioner and Genevieve Anderson became its *466 secretary-treasurer and remaining shareholder. MRG became petitioner's wholly-owned subsidiary. Petitioner emphasized mustard seed in its business. However, it also dealt in safflower oil and meal, mustard oil and meal, and canary seed and grain. In contrast, MRG handled nothing except mustard seed. In order to minimize the need for outside financing, petitioner and MRG regularly and frequently borrowed from one another over the years. [2] (Prior to 1960 the partnership and MRG also borrowed from one another.) These intercompany loans were booked as open accounts and were consistently reflected on the parties' balance sheets and financial statements as loans payable and loans receivable. However, no debt-evidencing instruments were ever drawn nor was any provision made for the payment of interest. On June 30, 1975 petitioner owed MRG $312,188.04. *467 Petitioner was solvent at that time. [3]
On July 2, 1975 petitioner's directors and shareholders voted to liquidate the corporation under section 337. The plan of liquidation specifically provided for the payment of all of petitioner's debts. Both the Commissioner and the Montana Secretary of State were immediately notified of this action in accordance with applicable statutory procedures. The liquidation of MRG was also contemplated at this time. However, no formal action was taken in that regard. On July 3, 1975 petitioner and MRG entered into a contract with Continental Grain Company and Continental Grain Company (Canada), Ltd. (hereinafter referred to collectively as "Continental"). Under *468 the terms of the contract Continental agreed to purchase most of petitioner's fixed and operating assets (including six of its seven plants) and virtually all of MRG's fixed and operating assets (including its only plant). [4] *469 The total purchase price was $990,000, of which $890,000 was to be paid to petitioner and the balance (or $100,000) to MRG. The amount to be paid to petitioner was payable in installments: 30 percent at closing (July 3, 1975), 30 percent one year thereafter, and 40 percent two years thereafter, with interest at a percent on the deferred balance. The amount ot be paid to MRG was payable in full at closing. The contract also gave Continental an option to purchase an elevator, with a mustard seed flour mill therein, located in Conrad, Montana, which was then owned by petitioner but not otherwise subject to the agreement of sale. The option was required to be exercised within 24 months from the closing date. The contract also included a covenant not to compete which generally prohibited both petitioner and MRG from competing with Continental for a 5-year period. However, petitioner and MRG were expressly permitted to engage in the mustard flour manufacturing business during the period of time that petitioner continued to own the elevator referred to in the preceding paragraph. At the closing on July 3, 1975 Continental satisfied one of petitioner's mortgages by remitting cash directly to the noteholder. This payment was credited against the 30 percent installment due that day under the contract. The maximum amount of cash petitioner had on hand at that time was approximately $50,000. After the sale to Continental, petitioner continued to operate the Conrad elevator and flour mill. *470 MRG, having sold its only plant, became relatively inactive. On July 31, 1975 MRG advanced petitioner $421.49, increasing the intercompany account balance in MRG's favor from $312,188.04 to $312,609.53. On September 8, 1975 petitioner advanced MRG a total of $6,895, decreasing the intercompany account balance to $305,714.53. During the spring of 1976 petitioner was advised that Continental would not exercise its option to purchase the Conrad elevator and flour mill. Petitioner then decided to remain in business rather than liquidate. Accordingly, on June 10, 1976 it formally revoked its plan of liquidation. Petitioner also decided to reenter the seed business after the covenant not to compete expired because it did not see much future in merely manufacturing mustard flour. It therefore abandoned any intention of liquidating MRG. [5] After the covenant expired petitioner contemplated the reactivation of MRG and the resumption of business as it had existed immediately prior to the events of July 1975. On June 30, 1976 petitioner owed MRG $305,714.53. At that *471 time petitioner was solvent [6] and MRG had earnings and profits of $192,590.17. Petitioner did not report any dividends from a foreign corporation on its income tax return for the fiscal year ended June 30, 1976. Subsequent to the revocation of its plan of liquidation, petitioner continued to acquire considerable quantities of mustard seed from Canada.It used MRG to convert American and Canadian currencies and to pay for the seed that was purchased in Canada. MRG was otherwise inactive. During this period MRG had no business needs which required the repayment of any of the sums *472 which it had previously advanced to petitioner. After the convenant not to compete expired in July 1980, petitioner considered reactivating MRG. However, petitioner's president, Vernon Anderson, was then in his early 70's and reluctant to undertake that project by himself. Accordingly, he attempted to sell part or all of the outstanding stock in both MRG and petitioner at book value. Except for a small sale of stock in petitioner in October 1981, he was unsuccessful in this regard. Petitioner's books reflect the following year-end balances in its intercompany account with MRG: FYE
Balance
6/30/76
$305,714.53
6/30/77
305,714.53
6/30/78
288,329.91
6/30/79
53,429.91
6/30/80
53,429.91
6/30/81
252,711.66
6/30/82
251,224.35
In November 1978, five months after the Commissioner commenced his audit, petitioner debited its intercompany account by $ (Can) 234,900. Because of the exchange rate at the time, this amount was equivalent to $200,000. Petitioner reported the difference, or $34,900, as exchange income. [7] *473 Shortly after the November 1978 transaction Vernon Anderson personally borrowed $ (Can) 234,900, or $200,000, from MRG. During the fiscal year ended June 30, 1981 petitioner assumed this liability and credited its intercompany account by $200,000. [8]
Petitioner borrowed money from a bank during each of the years 1975 through 1981. The financial statements furnished to the bank in support of its loan applications consistently reflected its intercompany account with MRG. On its income tax return for the fiscal year ended June 30, 1982 petitioner included in income as a liquidating distribution the outstanding balance of the intercompany account, $251,224.35, less the basis of its shares in MRG, $117,869.84, or $133,354.51. Petitioner included this amount in income because it had abandoned by then any expectation of reactivating MRG. Moreover, petitioner could *474 afford to do so without adverse tax consequences, having incurred a net operating loss for that year. ULTIMATE FINDING OF FACT MRG did not forgive petitioner's debt during the fiscal year ended June 30, 1976. OPINION The parties agree that on June 30, 1975 petitioner was indebted to MRG in the amount of $312,188.04. Respondent contends that during the fiscal year ended June 30, 1976 petitioner abandoned its intent to repay this amount. Petitioner, of course, contends to the contrary. The cancellation of a shareholder's indebtedness by a corporation can constitute a distribution of property and a constructive dividend to the shareholder. Shephard v. Commissioner,340 F.2d 27, 30 (6th Cir. 1965), affg. per curiam a Memorandum Opinion of this Court; see section 1.301-1(m) Income Tax Regs.; cf. Estate of Simmons v. Commissioner,26 T.C. 409, 423 (1956). Whether a corporation cancels a debt, or conversely whether the sole shareholder abandons the intent to repay, is a question of fact with respect to which the taxpayer bears the burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.After carefully considering the record *475 as a whole, we are satisfied that petitioner has carried its burden. At trial petitioner's president, Vernon Anderson, testified that petitioner did not abandon its intent to repay but rather always regarded the balance in the intercompany loan account as a liability which would be satisfied upon MRG's need and demand for payment. Having observed the witness, we were impressed by his demeanor and find his testimony to be credible. Although we recognize that his testimony might be characterized as self-serving, we think it is supported by a number of other factors. We begin with the intercompany loan account. For many years petitioner and MRG engaged in a pattern of borrowing from one another in order to minimize the need for outside financing. Although no debt-evidencing instruments were drawn and no provision was made for the payment of interest, there is absolutely no question that these transactions constituted bona fide loans. Indeed, respondent expressly concedes that on June 30, 1975 petitioner owed MRG $312,188.04. Moreover, decreases in the balance of the account prior to that date concretely demonstrate petitioner's efforts to satisfy outstanding indebtedness. Petitioner *476 booked the intercompany loans as open accounts and consistently reflected the balance as a loan payable on its balance sheets and financial statements. It did not change this practice after the events of July 1975. Thus, it continued to recognize its intercompany account as a loan payable and disclosed it as such on financial statements which it furnished to third parties. For example, petitioner revealed the account to a bank when it sought financial assistance during each of the years 1975 through 1981. The disclosure of this liability to a third-party lender could only negatively affect petitioner's chances of securing a loan. Similarly, the disclosure of the account to prospective purchasers could only negatively affect Vernon Anderson's efforts to sell outstanding stock in petitioner at book value. Nevertheless, no effort was ever made to recharacterize the liability for reasons of expediency. MRG treated the intercompany account consistent with petitioner. After the events of July 1975 it continued to reflect the balance as a loan receivable and took no action inconsistent therewith (such as charging the debt off its books). It was not until the fiscal year ended June *477 30, 1982, after it had become apparent that MRG would not be reactivated and the pattern of transactions between that corporation and petitioner reinstituted, that the debt was effectively cancelled by a liquidating distribution. Respondent contends that petitioner abandoned its intent to repay the intercompany loan in one of two distinct periods during the fiscal year ended June 30, 1976. According to respondent, petitioner's intent changed in July 1975 or during the spring of 1976. We disagree. In targeting July 1975 as the critical period, respondent states that "the actions taken by [petitioner] to completely liquidate, the sale of its assets to [Continental], and the failure to retain adequate cash for repayment, all point to a termination of [petitioner's] intent to repay the outstanding intercompany debts." However, respondent does not tell us, and we fail to understand, why the sale of assets pursuant to a liquidation under section 337 is necessarily inconsistent with the continued intent to repay an intercompany loan. [9] Under Montana law a corporation which intends to dissolve is required to satisfy its liabilities. See Mont. Code Ann. § 35-1-906 (1981). Petitioner's *478 plan of liquidation recognized this provision and specifically provided for the payment of all outstanding debts.
What really appears to concern respondent is the fact that petitioner had no more than $50,000 in cash immediately after the sale of its assets to Continental. He argues that "when viewed in relation to the outstanding intercompany account balance of $312,188.04, the retention of only $50,000 clearly implies that [petitioner] did not intend to repay the debt." However, resondent overlooks the fact that petitioner was solvent after the sale.In fact, petitioner was more solvent after the sale than before.[10] *479 Furthermore, petitioner was significantly more liquid after the sale than before. [11] Under these circumstances we are not impressed by the fact that petitioner's cash reserve on July 3, 1975 was less than the balance in its intercompany loan account. In the alternative respondent contends that petitioner abandoned its intent to repay during the spring of 1976 shortly after it was notified that Continental would not exercise the option to purchase the Conrad elevator and flour mill. At that time petitioner decided to remain in business and therefore revoked its plan of liquidation. In contrast, MRG had no practical alternative but to remain inactive pending expiration of the 5-year covenant not to compete. [12] According to respondent, "the failure to pay the debt or restructure *480 it when faced with the radically changed circumstances facing both [petitioner] and [MRG] in the Spring of 1976 clearly indicates that a forgiveness of indebtedness was intended by the parties." In our opinion respondent's position is unpersuasive. The funds that would have been necessary to satisfy the intercompany loan account were essential to the active conduct of petitioner's business, whereas MRG had absolutely no need which required immediate repayment. Respondent appears to acknowledge this fact because he does not dwell on the matter but rather argues at length that the intercompany loan account should have been restructured to reflect usual, arms-length terms, i.e., a signed note, an appropriate interest rate, adequate collateral, a fixed maturity date, and an amortization schedule.However, we think respondent overlooks the essentially informal nature and the twenty-year history of the intercompany loan account. *481 Petitioner and MRG never before found it necessary to execute notes or provide for the payment of interest and yet there is no question about the character of their long-standing arrangement. Respondent's analogy to an unrelated, third-party lender is therefore inapt. We are equally unimpressed with respondent's remaining arguments. First, while it is true that petitioner only reduced the balance of the intercompany loan account by $26,063.69 over the course of seven years, [13] it is equally true (as we have already said) that MRG had no business needs which required repayment. Second, we think the fact that petitioner did not report any dividends from MRG on its income tax return for the fiscal year ended June 30, 1976 would be relevant if we were deciding whether an advance constituted a loan or a dividend in the year made. Here, however, we have a long history of loan activity about which there is absolutely no question. Under these circumstances we do not think the failure to pay dividends is particularly significant. Finally, the fact that petitioner included the intercompany loan account in income as a liquidating distribution in its fiscal year ended June 30, 1982 does not *482 support the conclusion that petitioner abandoned the intent to repay the liability during the fiscal year ended June 30, 1976. At the time it revoked its plan of liquidation, petitioner contemplated the reactivation of MRG and the resumption of business as it had existed immediately prior to July 1975. If this had happened, petitioner and MRG would undoubtedly have resumed their practice of actively borrowing from one another and the balance of the intercompany loan account would probably have been paid down. However, it was only during the fiscal year ended June 30, 1982 that it became relatively clear that MRG would not be reactivated. In view of the foregoing we hold that petitioner did not abandon its intent to repay the intercompany loan account during the fiscal year ended June 30, 1976. Accordingly, we do not reach the question whether there was an ordinary distribution or a partial liquidation. To give effect to our disposition of the issue herein, Decision will be entered for the petitioner. *483 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. Petitioner was indebted to MRG on the following year-end dates in the indicated amounts: June 30, 1970
$25,577.59 June 30, 1971
49,517.13 June 30, 1972
81,107.71 June 30, 1973
55,381.19 June 30, 1974
(1,226.97)
Although the year-end balances generally favored MRG, there were occasions when the interim balance for a particular year favored petitioner.↩
3. Petitioner's balance sheet as of June 30, 1975 reflected the following assets and liabilities: ↩
Assets
Liabilities
cash
$ 100.00
accounts payable
$751,691.04
accounts receivable
563,181.20
short-term notes
740,573.78
inventories
1,269,585.69
loans from
other current assets
28,824.27
shareholders
47,500.00
other investments
122,021.37
long-term notes
860,276.19
(principally MRG)
2,400,041.01
fixed depreciable
assets
444,422.00
land
3,890.00
shareholders'
other assets
497,328.55
equity
529,312.07
$2,929,353.08
$2,929,383.08
4. The contract provided that Continental would purchase all of petitioner's assets except its cash, accounts receivable, inventories, producer and product sales contracts, the Conrad elevator and flour mill (to be discussed above), a particular office building and equipment therein, and the trade name "P. J. Anderson & Sons." Although petitioner's stock interest in MRG was not specifically excluded from the assets to be sold, it was not subject to the agreement of sale. The contract provided that Continental would purchase all of MRG's assets except its cash, accounts receivable, inventories, producer and product sales contracts, and one particular automobile.
5. Petitioner would have liquidated MRG if Continental had exercised the option to purchase the Conrad elevator and flour mill.↩
6. Petitioner's balance sheet as of June 30, 1976 reflected the following assets and liabilities: ↩
Assets
Liabilities
cash
$ (42,196.64)
accounts payable
$251,737.77
accounts receivable
313,762.23 short-term notes
120,449.44
inventories
381,076.40 other current
other current assets
liabilities
36,543.53
(principally the
long-term notes
572,494.90
current portion of
981,225.64
the contract
receivable from
Continental)
291,874.30 other investments
(principally MRG and
the balance of the
contract receivable
from Continental)
477,043.25 fixed depreciable
assets
111,573.00 shareholders'
land
2,581.50 equity
554,488.40
$1,535,714.04 $1,535,714.04
7. Petitioner kept its books in United States dollars. Here, however, it reduced the intercompany account by the amount of Canadian dollars so that the balance on its books would be consistent with the balance on the books of MRG.
8. During that same year petitioner debited the account by $718.25 in an unrelated transaction. This debit accounts for the fact that the increase in the balance of the account from the fiscal year ended June 30, 1980 to the fiscal year ended June 30, 1981 is slightly less than $200,000.↩
9. Respondent does not contend that the adoption of the plan of liquidation (or, for that matter, the subsequent revocation of that plan) was motivated by anything other than legitimate business purposes.↩
10. On June 30, 1975 petitioner's assets exceeded its liabilities by $529,312.07. One year later the excess was $554,488.40. 11. Petitioner's liquidity, as measured by the difference between its current assets and current liabilities, was as follows: ↩
June 30, 1975
current assets
cash
$ 100.00? accounts receivable
563,181.20 inventories
1,269,585.69 other current assets
28,824.27 $1,861,691.16
less: current liabilities
accounts payable
751,691.04 short-term notes
740,573.78 shareholder loan
47,500.00 1,539,764.82
$ 321,926.34
June 30, 1976
current assets
cash
$ (42,196.64)
accounts receivable
313,762.23 inventories
381,076.40 other current assets
291,874.30 $ 944,516.29
less: current liabilities
accounts payable
251,737.77 short-term notes
120,449.44 other current liabilities
36,543.53 408,730.74
$ 535,785.55
12. Although the covenant not to compete permitted both petitioner and MRG to engage in the mustard flour manufacturing business, MRG was not in a position to do so, having sold virtually all of its fixed and operating assets (including its only plant) to Continental.↩
13. The reduction is determined as follows: ↩
loan balance at 6/30/75
$312,188.04
less: loan balance at 6/30/82
251,224.35
60,963.69
less: exchange rate income
(see fn. 7)
34,900.00
$ 26,063.69